UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| MICHAEL LYNN HOLMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00487-JMS-MJD |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**Findings of Fact and Conclusions of Law**

Michael Holmes, who is incarcerated by the Federal Bureau of Prisons (BOP), was assaulted by his cellmate Roderick Spratley in the Special Housing Unit (SHU) at the United States Penitentiary in Terre Haute, Indiana (USP Terre Haute). He brings this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* (FTCA), alleging that prison officials were negligent in failing to prevent the assault. The Court conducted a bench trial on May 9, 10, and 11, 2022. Mr. Holmes was present in person and by counsel and the defendant was present by counsel. Based on its evaluation of the evidence and testimony presented at the trial and the parties' arguments, the Court now issues the following findings of fact and conclusions of law.

## I. Findings of Fact[1]

### A. The USP Terre Haute SHU

USP Terre Haute is a high-security facility, and the SHU is a high-security unit within that institution. Dkt. 213 at 180:10-16. Inmates may be housed there for a number of reasons, including the inmates' protection, a disciplinary infraction, pending an investigation, or prior to a transfer.

---

[1] Any finding of fact that is more properly considered a conclusion of law is adopted as such. Similarly, any conclusion of law that is more properly considered a finding of fact is adopted as such.

Dkt. 213 at 147:2-5; dkt. 214 at 289:9-14; dkt. 215 at 39:18-20. Most of the inmates held in the

SHU are dangerous. Dkt. 214 at 204:23-205:1; *see also id.* at 165:16-17 ("Q What makes the Terre

Haute SHU a dangerous place? A It is the inmates."). Many of those inmates have a propensity for

conflict. *Id.* at 187:10-11. ("Most of the inmates down in the SHU are prone to fighting. That is a

lot of the reasons why they were down there."). Between July 15, 2013, and July 15, 2019, at least

89 inmates were assaulted, with at least nine of those attacks involving weapons. During that time,

there were also at least four homicides, with weapons used in at least two homicides. Ex. 4. at 11-

12.

### B. Trafficking in the SHU

During the time leading up to the incident at issue, inmates in the SHU would often traffic

contraband, including weapons. This included trafficking between inmates in the SHU and

trafficking with inmates on the Special Confinement Unit (SCU), which houses death row inmates.

Dkt. 214 at 29:23-30:2. A common method of trafficking contraband between SHU inmates

involved the use of "fish lines" between cells. To use fish lines, inmates would tear items such as

their blankets or bed sheets, braid them together to create a line, tie items to it, and then throw

those fish lines out from underneath their cell door onto the hallway in the cell range. Dkt. 213 at

201:1-4. Fish lines were a daily problem. Dkt. 214 at 74:4-16. In addition, SHU and SCU inmates

passed contraband through the ventilation and pipe chase systems in the walls. *Id.* at 66:21-67:3.

Holmes himself participated in fishing. Dkt. 213 at 47:3-9.

BOP policy required staff at the SHU to attempt to prevent the trafficking of contraband

within the prison and to keep inmates safe. Dkt. 214 at 61:13-20. These requirements included

frequent security checks of windows, doors, security sashes, locks, and other areas. Exs. 14-15,

21-25, 27-29. Each day, SHU staff make multiple, random, and unannounced rounds in the unit.

Ex. 14 at 1; dkt. 214 at 175:1-176:20; 72:3-74:3. Officers are also supposed to perform pat searches and wand searches effectively and thoroughly, covering all parts of the body, and to effectively and thoroughly search property when inmates are moving from one cell to another. Dkt. 214 at 83:22-85:11; 98:14-22. But officers did not always perform those searches thoroughly, and often did not do so. Dkt. 213 at 31:15-32:14.[2]

SHU staff also conduct random cell searches. *Id.* at 156:21-157:6; dkt. 214 at 331:15-20 ("The direction that we provided was that [staff] search every cell in a unit on a monthly basis, and if we found hard contraband or had intelligence that there was hard contraband, we would conduct a complete unit search or range search in addition to that, where we would search every cell up and down the range."). When cell searches are conducted, the inmate is removed from the cell, pat searched, and searched with a handheld metal detector. Ex. 29 at 4. Food carts entering the unit are required to be thoroughly searched and SHU staff must account for all utensils. Ex. 28 at 2-3. All laundry and supplies must also be screened with a handheld metal detector before entering the SHU. Ex. 14 at 8.

While staff were aware of the risk that inmates might attempt to traffic contraband into and within the SHU, they faced a number of logistical constraints in their efforts to prevent that trafficking. First, the gap between the floor and the bottom of cell doors that inmates used for "fishing," could not be closed because of safety concerns. Dkt. 214 at 148:11-149:4. In addition, the ventilation shafts running between the SHU and the SCU create a natural conduit between those facilities that cannot be severed without completely reconfiguring the ventilation system. *Id.* at 147:19-148:3. In performing the security checks, however, certain officers would sometimes ignore fish lines being used between inmates and walk past them, so long as the inmates did not

---

[2] While the United States points out that Holmes could not see everything that happened in other inmate's cells, the Court credits his testimony about his experience regarding cell transfers.

pull the line or make motions and were generally showing respect to the officers. The fish lines were impossible not to see. Dkt. 213 at 45:10-46:16 ("It was impossible not see it [the fish lines]. It is, like, that black tape running through this courtroom, you know."); *id.* 49:19–50:5 ("Q You said sometimes they leave it alone. What did you mean by that? A Sometimes . . . it depends on the move. Whoever it was, you know, they will see it and, you know, just mind their business and respect it and let you get whatever you got coming. And sometimes, like, if they pissed off at somebody or somebody been told on them or said something disrespectful, then, they will come and they will go around to all the tiers because they know everybody be fishing on each tier. And they will get to looking for stuff and just get on some . . . real police time and disrupt whatever we got going on.").

BOP staff also tried to find a permanent solution to inmate trafficking of contraband through the SHU/SCU air ducts, but those efforts were complicated both by the need to maintain air flow within the prison and by inmate sabotage. Dkt. 213 at 161:14-162:14 (describing a series of efforts to prevent trafficking through the ventilation ducts including foam, wire, and mesh, and concluding, "[W]e kept doing that with the facility to try to fabricate something, some sort of system or mesh system that would allow the air flow but catch the contraband. We tried that over the course of – honestly, we would try something, and the inmates, they would try something different."); dkt 214 at 70:23-71:13 ("Whenever we would find evidence that there was a cutout, those inmates would be removed from that cell, and the vents would be welded back over. We would move the inmates involved or that we believed to be involved to different ranges so that they didn't have that direct up and down contact through that vent system. . . . There was a time when they attempted to develop something to put in those vents to stop the potential for the pass of contraband, but most of those things, to my understanding, were blocking the air flow of the

4

vent system, so they weren't approved to be done."). BOP officers would also discover lines with contraband in the ventilation system in the walls running between the SHU and SCU cells, and they did not always address it. For example, while sometimes they would "pop" the line and take the items off the line—other times they would leave it alone and allow the prisoners to engage in the trafficking. Dkt. 213 at 49:23-49:24.

**C. Roderick Spratley**

Roderick Spratley was housed at the USP-Terre Haute SHU from May 16, 2016, to September 27, 2017. Ex. 110 at 1-2.

During his time in the SHU, Spratley would frequently cover up his cell windows to try to gain the officers' attention and acted aggressively and belligerently, often in an attempt to be placed near an inmate named Miller with whom he had a relationship. Dkt. 213 at 60:24-62:13. This created a security risk. Dkt. 215 at 53:20-54:5; 119:20-120:15.

Based on his behavior, Spratley was involved in several disciplinary actions in the months leading up to the altercation with Mr. Holmes:

- On November 15, 2016, upon exiting the recreation areas, Spratley was found to be in possession of a homemade knife five inches in length. For this incident, he was charged with and found guilty of possessing a dangerous weapon. Ex. 203; dkt. 214 at 235:14-238:22.

- On February 27, 2017, Spratley struck another inmate in the head and upper torso with a sharpened homemade weapon, causing serious injuries. Although the incident occurred in February 2017, it was discovered on surveillance video in May 2017. For this incident, he was charged with and found guilty of assaulting with serious injury. Ex. 205; dkt. 214 at 10:7-19.

- On March 7, 2017, Spratley was found to be in possession of a homemade weapon in his cell that was made from a broken pair of scissors and a toothbrush. For this incident, he was charged with and found guilty of possessing a dangerous weapon. Ex. 204; dkt. 214 at 134:24-135:4.

- On June 21, 2017, Spratley attempted to assault prison staff. That day, he covered up his cell window, refused to respond to verbal commands, and

5

when Lt. Koonce arrived at the cell, Spratley attempted to assault Lt. Koonce. During the entirety of the situation, Spratley continually threatened staff. For this incident, Spratley was charged with and found guilty of attempted assault without serious injury. Ex. 206; dkt. 214 at 137:12-16.

- On July 2, 2017, less than two weeks before his attack on Holmes, Spratley engaged in fighting with his cellmate. For this incident, Spratley was charged with and found guilty of fighting. Ex. 207; dkt. 214 at 20:24-21:22.

SHU officials Lt. Sherman and Lt. Koonce admit that Spratley was a "particularly dangerous" inmate, and that Spratley's conduct in the approximate 8-9 months preceding the attack was a "red flag." Dkt. 214 at 40:11-16 ("Given the four incidents of weapons that we have just discussed and the four instances of assault, attempted assault, and fighting that we just discussed in Exhibits 30 . . . and 203 through 207, would you say that Mr. Spratley was a particularly dangerous inmate? A: Yes."); 249:11-14 ("So three out of 23 [weapons confiscations from the SHU] in a six-year time period, would that suggest to you that Mr. Spratley was a particularly dangerous inmate? A: Yes."); 239:20-23 ("That is two possession of weapons charges for Mr. Spratley over the course of four months. Do you think that that is getting to the point where that is a red flag? A: Yes.").

### D. Holmes and Spratley's Relationship

On July 3, 2017, BOP officers placed Spratley in the same cell as Holmes. Dkt. 213 at 63:2-19; Ex. 110 at 2.

About an hour after being placed in a cell with Holmes, Spratley covered up the cell window. Dkt. 213 at 63:23-25. Officer Tindall came to the door and, apparently knowing that it would have been Spratley and not Holmes who covered the window, said, "Spratley, what is the problem? Uncover the window so I can see in the cell." *Id.* at 64:2-3. Spratley told Officer Tindall that he did not want to be in the cell and "you all need to get me out of here." *Id.* at 64:9-11. Lt. Koonce also came to the cell door and Spratley expressed that he was not going to stay in the cell

with Holmes, and he wanted to be near inmate Miller. *Id.* at 63:9-65:24. Spratley was moved from Holmes's cell the next day. Ex. 110.

Three days later, on July 7, 2017, Officers Tindall and Porter brought Spratley back to Holmes's cell. Ex. 110. At that point, Holmes objected to Spratley's placement in a cell with him. Dkt. 213 at 68:7-9. Holmes told the officers that he did not want to be in a cell with Spratley because of Spratley's violent history, Spratley having been found in possession of weapons, and due a concern that Spratley might specifically cause harm to him. Holmes specifically told Officers Tindall and Porter that he was not refusing a cellmate—he just wanted to refuse Spratley. *Id.* at 69:8-11. Officers Tindall and Porter told Holmes that if he refused Spratley as a cellmate, he would receive an incident report. *Id.* at 67:25-71:8.

At that point, Holmes asked to speak to Lt. Koonce. *Id.* at 69:16. Holmes then again objected to being in a cell with Spratley. Now with Lt. Koonce present, Holmes specifically said again that he did not want Spratley in his cell because he did not want "to go through nothing with this dude." *Id.* at 69:21-22. Lt. Koonce also told Holmes that if he refused Spratley as a cellmate, he would receive an incident report. Dkt. 213 at 70:17-25 ("I specifically told [Lt. Koonce] that I didn't want Spratley in my cell because he is familiar with Spratley being in possession of weapons. He is familiar with Spratley jumping on his cellies. Spratley stays in fights. He is always going through it with officers, covering up windows and cussing the people out. I am not trying to be sprayed with Mace and have my property tooken and all that. You know, can you please find him somebody else to stay with? I am not refusing a cellie, I am just refusing Spratley. To no avail, he sided with Officer Tindall and them and made me take Spratley as a cellie.").

Unbeknownst to Holmes while he was asserting his objections, Spratley had been standing against the wall and heard everything that Holmes was saying. When Spratley came into the cell,

he expressed frustration that Holmes had objected to being in a cell with him. Spratley also told Holmes again that he was trying to be near inmate Miller and to stay out of his way. Spratley also told Holmes that he had just beat up another cell mate. Dkt. 213 at 70:1-73:12.

On July 13, 2017, the Discipline Hearing Officer held the hearings for the three separate incidents in which Spratley was found guilty of assaulting with serious weapon, attempted assault, and fighting—the hearing was two days before the incident at issue in this case. Ex. 205, 206, 207. Spratley received a significant aggregate punishment.

The next day, Spratley became very angry. At that point, Spratley was still attempting to be housed near inmate Miller. Spratley covered up the window again, and this time he did so right before the officers made their last rounds of their shift. When they came to the cell, Spratley asked to speak to Lt. Koonce, and demanded to be moved. Spratley was cursing and yelling, and threatened that if they did not move him, he would tear the cell up and bust the sprinklers. Dkt. 213 at 74:13-79:15.

Holmes interjected and asked Lt. Koonce to move him out of the cell from Spratley, saying to Lt. Koonce, "You can move me out of the cell, you know but I am not trying to be part of this, man. You need to move me from around this guy or move him." *Id.* at 75:19-21. Holmes stated that he was "not trying to be involved with this dude, me and this dude get into it because he is trying to move and you all playing games with him." *Id.* at 76:1-3. Holmes told them they could move Spratley or move him, but the current arrangement was not going to work. Lt. Koonce once again refused his request. *Id.* at 75:14-76:3, 79:11-15.

**E. The July 15, 2017 Assault**

The next day, on July 15, 2017, Spratley attacked Holmes with two concealed homemade weapons—a flat steel weapon and an ice pick with a cap on it.[3] *Id.* at 102:19-104:6. During the attack, Spratley stabbed Holmes approximately seventeen times in the head, neck, shoulder, and face, Ex. 11; Ex. 102, and repeatedly told Holmes that he would kill him. Dkt. 213 at 89:3-11.[4] When officers learned something was going on, they came to the cell, and pepper sprayed both inmates in the cell—at that point, Holmes was able to disarm the ice pick from Spratley to defend himself. Dkt. 213 at 103:21-104:6; 108:24-25. As the officers kept yelling to stop, Spratley eventually threw the flat steel weapon out onto the cell range and submitted to hand restraints. Holmes, in a state of fear and duress, kept fighting. *Id.* at 84:25-85:1. After Lt. Koonce shot him with rubber bullets, Holmes also submitted to hand restraints. *Id.* at 85:4-7.

---

[3] Holmes described the icepick as follows: "It is an ice pick with string around it, and it, it looked like it, it is secured by something like a safety pin or something that we get out the, in the SHU that we use to…about the only thing we have to write with is, like, a rubber pen or something, a flexible pen. It look like one of them cases or something like that around the, around the pick part, the ice pick part." Dkt. 213 at 103:18-24.

[4] The United States suggests that Holmes's testimony that Spratley instigated the assault is not credible because Holmes did not defend himself at the disciplinary hearing charging him with possession of a dangerous weapon and fighting, and because of a statement he made to the nurse who treated him after the incident. First, at his disciplinary hearing, Holmes stated: "We had a disagreement and we settled it. I actually like the young man, but it was something that had to happen. I have no other comments." Ex. 6 at 8; dkt. 214 at 213:13-460:25. But the United States points to no evidence that the disciplinary charges of possession of a dangerous weapon and fighting require a finding regarding whether Holmes was the victim of the initial assault. Indeed, Holmes does not deny that he had the icepick and that he fought Spratley. Next, Nurse Dean, who treated Holmes after the incident, also testified that he later told her that it was just a misunderstanding. Dkt. 215 at 21:13-14. But this statement is not an admission that he initiated the incident and, at most, raises an inference that he did not want to talk about it at that time when, as the nurse testified, they were "on the range" and around other inmates. *See* dkt. 215 at 21:11-14. Finally, Holmes's and Spratley's injuries are consistent with Holmes's version of the events. Holmes was noted to have stab wounds that varied in depth and length, including puncture wounds, consistent with being assaulted by two different types of weapons, ex. 102, while Spratley had "[m]ultiple superficial abrasions," and a "2-inch laceration" between his lip and his nose, ex. 101. The Court therefore credits Holmes's testimony that Spratley initiated the altercation.

### F. Holmes's Injuries

During the attack, Holmes experienced severe pain, his stab wounds were bleeding excessively, and he suffered from a terrible headache. *Id.* at 86:9-16, 90:8-11. When Holmes was evaluated after the altercation, the nurse noted: "he has 13 stab wounds about his head that vary in depth and length. Some are jagged, and some are gaping. He has two above the right lateral brow area, one to his right medial brow area, and a puncture wound to his right posterior shoulder." Ex. 102. Holmes received puncture wounds above his eye from the capped ice pick, and received the stab wounds on his head, neck, and back from the steel flat weapon. Dkt. 213 at 92:8-96:5.

He was sent to the hospital emergency room and received 23 staples for his stab wounds. *Id.* at 90:16-17. When the staples were removed, it was as painful to Holmes as getting teeth pulled. *Id.* at 122:20-123:6. He also suffered from a fractured nose. *Id.* at 90:16-7. In the days following, he was in a lot of pain, afraid to sleep, and having terrible dreams. *Id.* at 108:8-21.

Holmes also testified that he was in fear for his life, and he was and still is traumatized. *Id.* at 87:18-20. He believes that he continues to suffer from additional physical injuries, including frequent and excruciating headaches; worsened vision, particularly in his right eye where he was stabbed on the brow line; numbness, pain, and swelling in his extremities; trouble breathing (which Holmes has only had issue with since receiving a fractured nose from the attack); and aggravation to existing back issues. *Id.* at 121:22-134:22. He further asserts that has suffers from mental and emotional injury including paranoia, nightmares, trouble sleeping, anxiety, depression, and experiencing suicidal thoughts—all of which he repeatedly reported to psychological services at the BOP. *Id.* at 134:23-140:11; 219:7-242:7. Holmes also fears for his life because he has been labeled a rat as a result of pursuing his tort claim, and a green light (*i.e.* a kill on sight directive) has been placed on his life. *Id.* at 44:3-16. A psychological services record from February 19, 2019

shows that as of that date, since Holmes had become a BOP prisoner in 2000, Holmes had 7 suicide

risk assessments—6 of those post-dated July 15, 2017. Ex. 9 at USA-002083.

## II. Conclusions of Law

Under the FTCA, a negligence claim against the United States is governed by "the law of

the place where the act or omission occurred." 28 U.S.C. § 1346(b). Thus, because the actions

Holmes complains of occurred in Indiana, Indiana law applies. *See id.* To prove negligence under

Indiana law, Holmes must establish: (1) a duty owed to him by the defendant; (2) a breach of that

duty by the defendant; and (3) that the breach proximately caused the plaintiff's damages. *Caesars*

*Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120, 1123 (Ind. 2010).[5]

### A. Duty

The parties do not dispute that the BOP owed Holmes a general duty of care during his

incarceration at the USP Terre Haute. *See* 18 U.S.C. § 4042.  This statute provides in pertinent part

that the BOP shall "(2) provide suitable quarters and provide for the safekeeping, care and

subsistence of all persons charged with or convicted of offenses against the United States, or held

as witnesses or otherwise" and "(3) provide for the protection, instruction, and discipline of all

persons charged with or convicted of offenses against the United States." 18 U.S.C.

§ 4042(a)(2)(3).

Under Indiana law, the duty and causation elements of negligence include a foreseeability

requirement. *Goodwin v. Yeakle's Sports Bar and Grill, Inc.*, 62 N.E. 3d 384, 389-90 (Ind. 2016).

The court explained:

---

[5] In support of its motion for summary judgment, the United States argued that Holmes's claims were barred by the discretionary function to the FTCA. That argument was rejected because the United States had pointed to no evidence that officers exercised any discretion in performing searches or placing Spratley with Holmes. Dkt. 131 at 7, 10. The United States does not press the discretionary function exception again after the bench trial and it therefore has not been considered in these findings of fact and conclusions of law.

> [A] court's task—in determining "duty"—is not to decide whether
> a *particular* plaintiff's injury was reasonably foreseeable in light of
> a *particular* defendant's conduct, but rather to evaluate more generally whether the
> category of negligent conduct at issue is sufficiently likely to result in the kind of
> harm experienced that liability may appropriately be imposed on the negligent
> party. The jury, by contrast, considers "foreseeability" ... [in] more focused, fact-
> specific settings....

*Id.* at 391 (quoting *Strahin v. Cleavenger*, 603 S.E. 2d 197, 207 (2004)). "[T]he mere fact that a

particular outcome is 'sufficiently likely' is not enough to give rise to a duty. Instead, for purposes

of determining whether an act is foreseeable in the context of duty we assess 'whether there is some

probability or likelihood of harm that is serious enough to induce a reasonable person to take

precautions to avoid it.'" *Id.* (quoting *Satterfield v. Breeding Insulation Co.*, 266 S.W. 3d 347, 366

(Tenn. 2008)).

The Court finds that it was foreseeable to BOP staff that Spratley would assault Holmes

with contraband weapons. First, Spratley had a history of violence and weapons possession in the

SHU. In the eight months leading up to the incident at issue here, Spratley had been found to be in

possession of weapons three times. Ex. 203; 204; 205. In addition, during that time he had assaulted

another inmate with one of those weapons, ex. 205, had attempted to assault prison staff, ex. 206,

and had fought with his cellmate, ex. 207. In fact, Lts. Sherman and Koonce agreed that Spratley

was particularly dangerous. Dkt. 214 at 40:11-16; 249:11-14; 239:20-23. And, on July 13, 2017,

two days before the incident with Holmes, Spratley had disciplinary hearings for three of those

charges resulting in significant discipline. Ex. 205, 206, 207.

In addition to his general history of violence, Spratley had expressed specific displeasure

with his assignment to a cell with Holmes more than once. The first day he was celled with Holmes,

Spratley covered the cell window to get the officers' attention and asked to be removed from

Holmes's cell. Dkt. 213 at 63:23-64:11. While he was removed that day, he was placed back with

Holmes three days later. Ex. 110. At that point, Holmes also objected to Spratley's placement with

him. Dkt. 213 at 68:7-9. Holmes explained that he was not refusing a cellmate, he was just refusing

Spratley. *Id.* at 69:8-11. About a week later, Spratley covered the window again and demanded to

be moved. He threatened that if he was not moved, he would tear up the cell. *Id.* at 74:13-79:15.

At this time, Holmes again also objected to being celled with Spratley. *Id.* at 75:14–76:3, 79:11-

15.

Resisting this conclusion, the United States points out that Holmes did not object to the

placement with Spratley at any other opportunity, including when officers made rounds, to

executive staff, or during weekly executive rounds. Dkt. 215 at 159:17-21. The United States also

states that Holmes never told staff specifically that he was afraid of Spratley or that he felt

personally threatened by him and explains that if he had done so, they would have been separated.

Dkt. 215 at 105:24-106:3. The Court credits Mr. Holmes version of events in this regard. Mr.

Holmes did complain about Spratley, and when he did, he was threatened with a write-up and not

separated.  The Court finds sufficient evidence that, given the number and specificity of Holmes's

complaints about Spratley, BOP officials had sufficient information regarding their relationship to

be aware of a risk of assault.

The United States also relies on the Seventh Circuit's holding in *Parrott v. United States*,

536 U.S. 629, 637 (7th Cir. 2008), that, to prevail on an FTCA claim for failure to prevent an

assault, the plaintiff must show that "BOP staff knew *or reasonably should have known* of a

potential problem between the two inmates." (emphasis in *Parrott*). The United States focuses on

the words "between the two inmates" and contends that BOP officers did not have reason to know

of a potential problem between Spratley and Holmes. But the *Parrott* court did not define what it

means to know of a potential problem between two inmates. In fact, the court reversed the district

13

court's order granting summary judgment on the plaintiff's FTCA claim based on an assault by his

former cellmate. At the time, the plaintiff had complained to prison staff because his former

cellmate had written harassing letters to the plaintiff's ex-girlfriend. *Id*. at 631. In addition, the

plaintiff had a separation order, but it was unclear from the record who the order required him to

be separated from. *Id.* Holding that summary judgment for the United States was not appropriate,

the court explained that the district court should have accommodated the plaintiff's discovery

requests regarding the subject of the separation order, suggesting that if the other inmate was the

subject of the protection order, this would give the BOP reason to know of a potential problem

between the two. *Id.* at 638. But the court did not hold that a separation order, a specific complaint,

or any other particular facts are required to demonstrate a potential problem. Here, as discussed

above, there is ample evidence that BOP officials should reasonably have been aware of a potential

problem between Spratley and Holmes.

The United States also relies on the district court order in *Millbrook v. United States,* No.

2:10-CV-245-WTL-WGH, 2012 WL 1014977, at *6 (S.D. Ind. Mar. 23, 2012), another case

involving an FTCA claim by a prisoner at USP Terre Haute based on an assault by his cellmate.

While the assailant in *Millbrook* had a history of violence within the prison, the court held that the

United States did not breach a duty to the plaintiff because there was "no reason to believe that

[the alleged assailant] posed a particular and specific threat" to the plaintiff. *Id.* Unlike the

prisoners in *Millbrook*, however, not only did Spratley have a history of violence, but prison

officials were aware of conflict between Holmes and Spratley based on the multiple times that they

objected to being celled together.

The Court further finds that it was foreseeable that Spratley would assault Holmes with

contraband weapons. Weapons possession and assaults were common in the SHU at the time of

the assault. Thus, BOP officials knew, or reasonably should have known, that security measures within the prison were deficient due to the frequency of contraband trafficking, weapons possession, and assaults involving weapons. Nonetheless, while BOP officials took some measures to attempt to prevent fishing and other trafficking, those measures were not sufficiently thorough. Notably, the Court credits Holmes's testimony that officers sometimes would not perform through searches during cell rotations and would often ignore fishlines on the floor and within the ventilation system. Dkt. 213 at 31:15-32:14; 45:10-46:16.

In sum, BOP officers were aware that Spratley had a history of violence and a history of conflict with Holmes. This was enough for a reasonable officer to be aware of a potential problem between Holmes and Spratley. Further, officials were aware of weapons trafficking and reasonably should have been aware of a risk that Spratley would assault Holmes with a weapon. The assault on Holmes was therefore reasonably foreseeable and the BOP had a duty to prevent it.

### B. Breach

The Court next finds that the BOP breached its duty to protect Holmes from the assault. Spratley was placed in Holmes's cell even though Spratley was known to be particularly dangerous, was acting angry and belligerent with officers, and both inmates objected to the placement. Further, officers knew that weapons trafficking was taking place in the SHU and did not take reasonable measures to prevent it. By failing to take measures to prevent the assault, the BOP breached its duty to Holmes. The Court recognizes the United States' argument that "[r]unning a prison is an inordinately difficult undertaking" that should be committed to the discretion of prison administrators. *Turner v. Safley*, 482 U.S. 78, 84-85 (1978). But the Court's finding here is not a direction on how the officials should run the USP Terre Haute, but simply an acknowledgement that prison officials were negligent in this case.

15

### C. Causation and Injury

Finally, the BOP's breach of its duty to Holmes caused him injury. "A negligent act is said to be the proximate cause of an injury 'if the injury is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated.'" *Paragon Fam. Rest. v. Bartolini*, 799 N.E.2d 1048, 1054 (Ind. 2003) (citing *Bader v. Johnson,* 732 N.E.2d 1212, 1218 (Ind. 2000)). As the Court has already discussed at length, the fact that Spratley would assault Holmes with contraband weapons was reasonably foreseeable. As a result of the assault, Holmes suffered a broken nose and 17 stab wounds that required 23 staples to close and which were painful to remove. He experienced excruciating pain, headaches, and loss of sleep. The Court finds that these injuries were caused by the BOP's failure to prevent the assault.

Holmes also contends that he has suffered additional serious physical injuries that continue to this day, including frequent and excruciating headaches; worsened vision, particularly in his right eye where he was stabbed on the brow line; numbness, pain, and swelling in his extremities; trouble breathing (which Holmes has only had issue with since receiving a fractured nose from the attack); and aggravation to existing back issues. Dkt. 213 at 121:22-134:22. Holmes further asserts that he has experienced psychological injury because of the assault. But Holmes has never received an opinion from a medical professional that the ongoing frequent headaches, blurred vision, paranoia, alleged post-traumatic stress disorder, and bad dreams were caused by this assault. Dkt. 215 at 674:13-675:2. The Court finds that Holmes has not shown that any long-term physical or psychological injuries were caused by the failure to prevent the assault by Spratley.

### III. Conclusion

As discussed above, based on its evaluation of the evidence and testimony presented at the bench trial, the Court finds that Roderick Spratley assaulted Holmes on July 15, 2017, and that the

16

United States was negligent in failing to prevent that assault. As a result, Holmes suffered several

physical injuries, including 17 stab wounds that required staples to close, and a fractured nose that

caused him serious physical pain. Accordingly, the Court awards $20,000 in damages against the

United States and in Holmes's favor.[6] Judgment consistent with the Order granting summary

judgment on Holmes's claims against the individual defendants based on his failure to exhaust

available administrative remedies, dkt. 77, and this Order shall now issue.

**IT IS SO ORDERED.**

Date: 9/1/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

MICHAEL LYNN HOLMES
60545-004
ATWATER - USP
ATWATER U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 019001
ATWATER, CA 95301

All Electronically Registered Counsel

---

[6] In its proposed findings of fact and conclusions of law, the United States suggests that any award of Holmes's damages to Holmes should take "into account both Spratley's responsibility for the altercation as well as Holmes's, including the 'highly probable' fact that the weapons used in the altercation would not have been available if Holmes had not actively and willingly facilitated the trafficking of contraband into the USP Terre Haute SHU." Dkt. 226 at 27. To the extent this can be understood to be an argument that Holmes was contributorily negligent or some other defense to liability, this argument has not been developed and is waived. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived") (quoting *United States v. Berkowitz*, 927 F.3d 1376, 1384 (7th Cir. 1991)).